MUSICLAND GROUP, INC., Respondent,

v.

CERIDIAN CORPORATION,
et al., Appellants.

No. C7-93-402.

Court of Appeals of Minnesota.

Nov. 16, 1993.

Review Denied Jan. 27, 1994.

526

Jon P. Parrington, Jeffrey J. Lindquist, Pustorino, Pederson, Tilton & Parrington, Minneapolis, for Musicland Group, Inc.

William J. Keppel, Christopher J. Riley, Kevin J. Saville, Dorsey & Whitney, Minneapolis, for Ceridian Corp., et al.

Considered and decided by KLAPHAKE, P.J., HUSPENI and SCHUMACHER, JJ.

## OPINION

HUSPENI, Judge.

This appeal is taken from the district court's grant of summary judgment to respondent Musicland on its claim brought pursuant to the Minnesota Environmental Response and Liability Act (MERLA) and from the grant of summary judgment to Musicland on appellant Control Data's MERLA counterclaim. Control Data further challenges the damages and attorney fees awarded to Musicland pursuant to MERLA. We affirm in part, reverse in part and remand.

## FACTS

In 1969, Control Data bought a manufacturing facility in St. Louis Park. The facility was used for the manufacture of printed circuit boards and became known as the Printed Circuits Operations Facility (PCO facility). Control Data used various volatile organic compounds (VOCs) in the manufacturing process. One VOC, 1–1–1 Trichloro-

ethane (TCA), was used to clean circuit boards.

Control Data began monitoring the groundwater beneath the PCO facility in 1984. It became aware of contamination in the soil and groundwater shortly after discovering a break in the PCO facility's wastewater process line. An investigation of the contamination revealed that a high level of TCA was present in the direct vicinity of the break. The Minnesota Pollution Control Agency (MPCA) placed the PCO facility on the Permanent List of Priorities, also known as the State Superfund List.

Musicland owned property across the street and directly west of the PCO facility. In June 1987, Musicland decided to build a warehouse on the property. Ground clearing commenced in late October 1987. On November 3, 1987, Musicland began pumping groundwater, without a permit, from two dewatering wells located on the eastern edge of its property. Two days later, Control Data informed Musicland of the contamination beneath its property. Musicland immediately ceased dewatering.

Musicland retained the services of an environmental consultant to evaluate the impact of the contamination on the construction project. Musicland met with the consultants to discuss alternative dewatering methods to prevent the contamination from migrating onto its property. An alternative dewatering method was adopted and the construction project was eventually completed. It is undisputed that Musicland's property was not contaminated in the process.

When efforts to negotiate an economic solution failed, Musicland brought this lawsuit against Control Data pursuant to MERLA for the recovery of necessary response costs and economic losses.[1] Control Data filed a counterclaim against Musicland under MERLA to recover costs it incurred in attempting to stabilize the contaminated groundwater beneath its property after Musicland's dewatering activities.

The trial court granted summary judgment in favor of Musicland on its MERLA claim. It also granted summary judgment in favor of Musicland on Control Data's MERLA counterclaim. The case went to trial on Musicland's remaining common law claims and the issue of damages.

The jury concluded that Control Data was negligent and awarded Musicland $188,618.61 in damages. The trial court awarded Musicland $192,377.89 in attorney fees and expert witness fees under MERLA.

## ISSUES

1. Does MERLA provide relief to a private individual whose response costs and economic losses were not the result of actual contamination on the individual's property?

2. Did Control Data present genuine issues of material fact with respect to available defenses under MERLA to withstand entry of summary judgment on the issue of its liability?

3. Did the trial court err by granting summary judgment in favor of Musicland on Control Data's MERLA counterclaim?

4. Were damages awarded to Musicland recoverable under MERLA?

5. Does the evidence support a finding that Control Data was negligent?

6. Did the trial court err by entering judgment for the full amount of damages awarded by the jury?

7. Is the trial court's award of attorney fees an abuse of discretion?

## ANALYSIS

■ Control Data contends that MERLA only provides relief to private individuals whose property is actually contaminated by hazardous substances, and the trial court, therefore, erred by applying MERLA to the instant case because Musicland's property never suffered from contamination. Construction of a statute is a question of law and

1. Control Data was the named defendant in the underlying action which began in 1989. In 1992, Control Data reorganized its operations and changed its name to Ceridian Corporation. The case caption was amended to reflect the name change, and Musicland joined Control Data as a party. Both Ceridian and Control Data are appellants in this action, but for simplicity, we will refer only to Control Data.

subject to de novo review. *Doe v. State Bd. of Medical Examiners,* 435 N.W.2d 45, 48 (Minn.1989).

### I. Applicability of MERLA

■ The Minnesota legislature enacted MERLA in 1983 in response to the growing concern over the effects of environmental contamination. Alan C. Williams, *A Legislative History of the Minnesota "Superfund" Act,* 10 Wm.Mitchell L.Rev. 851, 853 (1984). The primary purposes of MERLA have remained constant throughout its history. They are: (1) to impose strict liability on those responsible for harm caused by the release of hazardous substances; (2) to allow the state to clean up contamination and collect costs later; and (3) to fund state cleanup activity. *Id.* at 858.

■ MERLA was modeled after the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). *Id.* at 856. While the primary purpose of CERCLA is to clean up hazardous waste sites, *Barmet Aluminum Corp. v. Reilly,* 927 F.2d 289, 291 (6th Cir. 1991), it is also intended to protect and preserve public health and the environment. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir. 1986). CERCLA, however, only provides for the recovery of response costs. 42 U.S.C. § 9607 (1986). The Minnesota Act is broader than CERCLA in that it provides a cause of action for the recovery of damages for personal injury and economic losses caused by the release of hazardous chemicals into the environment. Williams, *A Legislative History* at 852–53.

Section 115B.04, subd. 1 (1990) of MERLA provides:

> [A]ny person who is responsible for a release *or threatened release* of a hazardous substance from a facility is strictly liable, jointly and severally, for the following response costs and damages which result from the release or threatened release or to which the release or threatened release significantly contributes:

> (a) All reasonable and necessary response costs incurred by the state, a political subdivision of the state or the United States;

> (b) All reasonable and necessary removal costs incurred by any person; and

> (c) All damages for any injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss.

(Emphasis added.) "Removal" includes:

> (b) *Necessary actions taken in the event of a threatened release* of a hazardous substance, or a pollutant or contaminant, into the environment;

> \*     \*     \*     \*     \*     \*

> (e) *Other actions necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment,* which may otherwise result from a release or threatened release.

Minn.Stat. § 115B.02, subd. 17 (1990) (emphasis added).

■ Musicland asserts that actual contamination need not occur under MERLA because the statute allows a private party to recover response costs associated with a "threatened release" of hazardous substances into the environment. *See* Minn.Stat. § 115B.04, subd. 1. It argues that, where an individual incurs costs in response to a threatened release, it is unlikely that the individual's property suffers from actual contamination since the hazardous materials have not yet been injected into the environment. Control Data disagrees and contends MERLA does not allow a private party to recover response costs that result from a threatened release. We agree with Musicland and conclude that MERLA allows the recovery of response costs for a threatened release.

The only limitation on liability for threatened releases is contained in section 115B.04, subd. 3 which states:

> Liability [under section 115B.04] for a threatened release of a hazardous substance is limited to the recovery *by the agency* of reasonable and necessary response costs as provided in section 115B.17, subdivision 6.

Minn.Stat. § 115B.04, subd. 3 (1990) (emphasis added). The "agency" is the commissioner of agriculture for actions relating to agricultural chemicals, or the pollution control agency for other substances. Minn.Stat. § 115B.02, subd. 3 (1990). Thus, the agency's recoverable response costs for a threatened release are limited to costs provided for in section 115B.17, subd. 6; recoverable response costs for a threatened release are not limited to the agency.

A further indication that a private individual is entitled to recover response costs for a threatened release under MERLA is the fact that a private party may recover *removal* costs under section 115B.04. (The state, political subdivisions of the state, and the United States may recover removal *and* remedial costs.) Minn.Stat. §§ 115B.04, subd. 1(a), (b), 115B.02, subd. 18 (1990). MERLA defines "removal" to include necessary actions taken in the event of a threatened release. Minn.Stat. § 115B.02, subd. 17.

Because a private party is entitled to recover response costs incurred as a result of a "threatened release" of hazardous substances, MERLA clearly intends to provide relief to individuals who act to prevent contamination of the environment, not only those who act in response to actual contamination. Hence, actual contamination is not required in order to recover response costs and economic losses pursuant to MERLA. *Cf. Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1152 (1st Cir.1989) (actual contamination of property need not occur to recover response costs under CERCLA).

■ Our analysis of MERLA's implementation, however, requires additional inquiry. Recognizing the applicability of MERLA, Control Data further contends that Musicland's losses resulted from the "threatened release" of hazardous substances and not an actual release, thus preventing Musicland from recovering economic losses. *See* Minn. Stat. § 115B.05, subd. 1 (1990) (an actual release of a hazardous substance must occur to recover economic losses). We believe Control Data's contention that the release was only "threatened" must fail.

A "release" is defined as

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment which occurred at a point in time or which continues to occur.

Minn.Stat. § 115B.02, subd. 15 (1990). While MERLA does not define "threatened release," there is no dispute that Musicland's losses would not have occurred but for Control Data's initial and *actual* release of hazardous materials into the environment. Thus, we conclude that an actual release *did* occur and Musicland was entitled to recover its economic losses.

■ MERLA's objective to protect the public health and minimize the harmful effect of hazardous substances in the environment would be frustrated if the Act was construed solely as a cleanup statute. Although the removal of hazardous substances from the environment is ideal, preventing the spread of contamination is remarkably worthwhile to the safety of the environment and public health. Musicland was entitled to recover its response costs and economic losses under MERLA, even though its property was never actually contaminated.[2]

### II. Defenses available

■ Control Data contends that the district court erred in awarding summary judgment to Musicland because genuine issues of material fact exist with regard to defenses available to Control Data under MERLA. We disagree. A party opposing a motion for

---

2. The district court concluded that:

Control Data Corporation has already been determined to have released a hazardous substance by virtue of accepting clean up responsibility under the Superfund Act and the consent order with the Minnesota Pollution Control Agency.

The fact Control Data entered into a consent order and voluntarily undertook response action to remove or remedy the contamination beneath its property does not in itself make it liable under MERLA. *See* Minn.Stat. § 115B.175, subd. 1 (1990) (a person who undertakes response actions in accordance with a voluntary response action plan approved by the commissioner is not responsible for the release or threatened release unless otherwise responsible under sections 115B.01 to 115B.18). We have concluded that Control Data was otherwise responsible under sections 115B.04 and 115B.05.

summary judgment must come forward with affirmative evidence sufficient to create a genuine issue of material fact and may not rely upon mere averments in the pleadings or unsupported allegations. *Marose v. Hennameyer*, 347 N.W.2d 509, 511 (Minn.App. 1984). The party cannot depend upon the possibility of developing evidence at trial. *O'Neil v. Kelly*, 307 Minn. 498, 499, 239 N.W.2d 231, 232 (1976).

MERLA provides:

It is a defense to liability under this section that the release or threatened release was caused *solely* by:

  \*  \*  \*  \*  \*  \*

(d) An act or omission of a third party or the plaintiff.

Minn.Stat. § 115B.04, subd. 7 (1990) (emphasis added); *see also* Minn.Stat. § 115B.05, subd. 6 (1990). While Control Data presented evidence suggesting that "the original source of the TCA contamination on its property was unknown," the evidence did not support the contention that these other sources were the *sole* cause of the contamination. Control Data could not rule out the possibility that it contributed to the contamination. Because Control Data failed to raise a genuine issue of material fact regarding the defenses available under MERLA, summary judgment was proper. *Hennameyer*, 347 N.W.2d at 511.

### III. Control Data's MERLA counterclaim

■ Control Data next contends that the district court erred by entering summary judgment in favor of Musicland on Control Data's MERLA counterclaim. Summary judgment is appropriate when there is no genuine issue as to any material fact and a party is entitled to judgment as a matter of law. Minn.R.Civ.P. 56.03. A material fact is one which will affect the result or the outcome of the case depending on its resolution. *Zappa v. Fahey*, 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976) (per curiam). In

reviewing a summary judgment, this court must determine whether any genuine issues of material fact exist and whether the trial court correctly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). The facts must be viewed in the light most favorable to the nonmoving party. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982).

To establish a prima facie case of liability under MERLA, Control Data must prove that: (1) Musicland was a person responsible (2) for the release or threatened release of a hazardous substance from a facility into the environment, (3) which caused or significantly contributed to (4) reasonable and necessary response costs. Minn.Stat. § 115B.04, subd. 1.

### "Release" of a hazardous substance

■ Like CERCLA, MERLA provides a broad definition of "release."[3] Courts have interpreted the term liberally and have consistently rejected attempts to narrow it. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir.1989) ("[t]he plain statutory language fails to impose any quantitative requirement on the term"); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1045 (2d Cir. 1985) ("[w]e will not interpret section 9607(a) in any way that apparently frustrates the statute's goals"); *Amland Properties Corp. v. Aluminum Co. of Am.*, 711 F.Supp. 784, 793 (D.N.J.1989) (noting courts' inclination to give the term a broad reading).

■ Musicland argues that it never put any hazardous substances into the environment because they were already there. There is nothing in the language of MERLA or in its legislative history, however, limiting liability to persons responsible for the initial release of hazardous substances into the environment. MERLA acts to prevent the injection of hazardous substances into the environment, as well as activities that further aggravate the contamination. Therefore, a second release of hazardous substances may occur if a person's activities are responsible

---

**3.** A "release" is defined as

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the

environment which occurred at a point in time or which continues to occur.

Minn.Stat. § 115B.02, subd. 15.

for producing further contamination of a portion of the environment that was otherwise untainted. *See Shore Realty,* 759 F.2d at 1045 (contaminants leaching through soil into groundwater constitutes a release); *Lincoln Properties, Ltd. v. Higgins,* 823 F.Supp. 1528, 1536–37 (E.D.Cal.1992) (passive landowner may be liable for a "release" where hazardous materials have migrated after their initial introduction into the environment, even if the landowner was not responsible for the initial release); *Vermont v. Staco, Inc.,* 684 F.Supp. 822, 832–33 (D.Vt.1988) (migration of contamination from one area to another constitutes a release).

If Musicland's dewatering activities caused migration of the contamination beneath Control Data's property, a release of hazardous substances under MERLA may have occurred.

### *"Facility"*

The term "facility" has been defined under MERLA to include

> [a]ny site or area where a hazardous substance, or a pollutant or contaminant, has been deposited, stored, disposed of, or placed, or otherwise come to be located.

Minn.Stat. § 115B.02, subd. 5(c) (1990). Musicland contends that the aquifers do not constitute a "facility."

▮▮▮ It is clear from the definition that the term is broad, and courts have consistently interpreted it so. *See United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 743 (8th Cir.1986) ("facility" should be construed very broadly to include "virtually any place at which hazardous wastes have been dumped, or otherwise disposed of"), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Kelley v. Thomas Solvent Co.,* 727 F.Supp. 1532, 1545 (W.D.Mich.1989) (locations where hazardous substances were found in the soil and groundwater were "facilities"); *United States v. Bliss,* 667 F.Supp. 1298, 1305 (E.D.Mo. 1987) (definition of "facility" includes "both the container from which a hazardous substance has been released and the site where

those hazardous substances have been placed"); *United States v. Ward,* 618 F.Supp. 884, 895 (E.D.N.C.1985) ("facility" includes roadside where hazardous waste was dumped).

▮▮▮ Hazardous substances have "come to be located" in the aquifers beneath Control Data's property. Thus, the contaminated aquifers could be considered a "facility" under MERLA. Likewise, if Musicland's dewatering activities caused the contamination to migrate onto its own property, the aquifers beneath its property could also be considered a "site or area" constituting a "facility." [4]

### *"Responsible person"*

Control Data contends that Musicland is a responsible person under MERLA as defined in section 115B.03. MERLA states:

> [A] person is responsible for a release or threatened release of a hazardous substance, or a pollutant or contaminant, from a facility if the person:
>
> (a) Owned or operated the facility:
>
> > (1) when the hazardous substance, or pollutant or contaminant, was placed or came to be located in or on the facility;
> >
> > (2) when the hazardous substance, or pollutant or contaminant, was located in or on the facility but before the release; or
> >
> > (3) during the time of the release or threatened release.

Minn.Stat. § 115B.03, subd. 1(a) (1990).

▮▮▮ Like CERCLA, MERLA aims to impose liability on individuals who have some control over the treatment of hazardous materials. *See Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 657 (N.D.Ill.1988) ("[o]nly those who actually operate or exercise control over the facility that creates an environmental risk can be held liable under CERCLA for the cost of reducing that risk"), *aff'd* 861 F.2d 155 (7th Cir. 1988). Musicland had the ability to regulate its dewatering activities. If Control Data

---

4. Control Data failed to present evidence that Musicland's dewatering activities caused the contamination to migrate onto its property. Music- land, however, conceded for purposes of the summary judgment motion, that such contamination, in fact, occurred.

can establish that Musicland's dewatering process caused the contamination to migrate, Musicland arguably had control over the treatment of the hazardous material beneath Control Data's property. In that event, Musicland might be considered an operator of the facility beneath Control Data's property. Alternatively, if Control Data can establish that hazardous materials came to be located on Musicland's own property, Musicland could be considered an owner or operator of the facility beneath its property.

The question of whether Musicland is an "owner or operator" under MERLA hinges on whether Musicland was in a position of control over the treatment of the hazardous substances at the time of their release. Musicland could be found to be an "owner or operator" of the facility from which the hazardous substances were released if it exerted an ample degree of control over the facility. *See, e.g., Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1341 (9th Cir.1992) ("operator" liability under CERCLA "only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment"); *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 843 (4th Cir.1992) (the authority to control the hazardous material is the appropriate standard to apply to operator status), *cert. denied,* —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); *CPC Int'l, Inc. v. Aerojet–General Corp.,* 731 F.Supp. 783, 788 (W.D.Mich.1989) (whether a party is an owner-operator under CERCLA depends upon the degree of control that party is able to exert over the activity causing the pollution).

There is a material fact issue for trial as to whether Musicland exerted a sufficient degree of control over the facility from which hazardous substances were released to be considered an "owner or operator" under MERLA. We therefore reverse the entry of summary judgment on Control Data's MERLA counterclaim and remand for trial.[5]

## IV. Damages awarded

Control Data contends that the damages awarded Musicland were neither reasonable nor necessary removal costs under MERLA. We disagree. Under MERLA, "remove" or "removal" includes

(c) Actions necessary to monitor, test, analyze, and evaluate a release or threatened release of a hazardous substance, or a pollutant or contaminant;

\* \* \* \* \* \*

(e) Other actions necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from a release or threatened release.

Minn.Stat. § 115B.02, subd. 17(c), (e).

Musicland retained an environmental consultant to evaluate the contamination's impact on its dewatering activities once it learned of the contamination beneath Control Data's property. The investigatory costs Musicland incurred were not duplicative. Although the government had already investigated the contamination and approved a remedy for addressing the problem, its investigation was conducted with an eye toward cleaning up the contamination. Musicland, on the other hand, needed to determine the ramifications of dewatering on its own property and how to prevent the contamination from further adversely affecting the environment.

Musicland remedied the situation by altering its dewatering process. The alternative system allowed the dewatering process to continue without spreading the contamination. Musicland's actions were both reasonable and necessary to minimize the damage to the public health and welfare of the environment, and therefore its response costs were recoverable. Because there was a release of contaminants, Musicland was also entitled to recover "*all* damages for actual economic loss" even though its property was not actually contaminated. Minn.Stat. § 115B.05, subd. 1(a) (emphasis added).

---

**5.** Although for purposes of the summary judgment motion Musicland accepted as fact that its dewatering activities caused contamination to migrate, Control Data must present evidence at trial to support this contention.

## V. Negligence

■ Control Data asserts that the evidence was insufficient to support the jury's finding of negligence. Control Data did not bring a motion for amended findings or a new trial. Therefore, this court's review is limited to whether the evidence is sufficient to support the factual findings made by the jury, and whether those findings are sufficient to support the legal conclusions made by the trial court. *Dairy Farm Leasing Co. v. Haas Livestock Selling Agency, Inc.*, 458 N.W.2d 417, 418 (Minn.App.1990). On review:

> [A]nswers to special verdict questions will not be set aside unless they are perverse and palpably contrary to the evidence or where the evidence is so clear to leave no room for differences among reasonable people.

*Karnes v. Milo Beauty & Barber Supply Co.*, 441 N.W.2d 565, 567 (Minn.App.1989), *pet. for rev. denied* (Minn. Aug. 15, 1989). The evidence must be viewed in the light most favorable to the verdict. *Id.*

■ At trial, Musicland established that Control Data worked with large quantities of TCA and began monitoring the groundwater beneath its property in 1984. Musicland showed that a break occurred, due to erosion, in Control Data's wastewater process line in 1987. Immediately after the break was discovered, Control Data detected large quantities of TCA in the soil and groundwater. The largest quantities were detected directly beneath the break.

While some aspects of environmental contamination are complex and require the assistance of expert testimony, the issues involved in this case were not beyond the comprehension of a lay juror. The evidence was sufficient to support a finding that, as a result of Control Data's failure to inspect its wastewater line, hazardous substances were released from its facility into the soil and groundwater. Further, the presence of contamination in Control Data's aquifers caused Musicland to incur costs in order to prevent the contamination from spreading. Accordingly, the jury's verdict is not manifestly unreasonable. *See Alden Wells Veterinarian Clinics, Inc. v. Wood*, 324 N.W.2d 181, 184 (Minn.1982) (a jury verdict on negligence must be reversed only if manifestly unreasonable).

## VI. Inconsistent verdict

The jury returned a special verdict and answered two questions inconsistently. The special verdict form instructed the jury to only allocate comparative fault if it found both parties negligent. Even though the jury found Musicland was *not* negligent in failing to discover the contamination on Control Data's property,[6] it allocated 20% of the fault to Musicland and 80% to Control Data. Its award of $188,618.61 in damages to Musicland was exactly 80% of the amount Musicland requested. The trial court recognized that the jury failed to follow the proper instructions and rendered judgment against Control Data in the amount indicated by the jury. Control Data contends that the trial court erred, and that the award should reflect Musicland's comparative fault. We find no error.

■ The general principles governing a judge's handling of inconsistent verdicts are well established, and permit the trial court to:

> (1) render judgment against the party having the burden of proof;
>
> (2) order a new trial;
>
> (3) send the jury back for further deliberations; or
>
> (4) reconcile the inconsistent answers by using the court's powers of interpretation or power to partially direct a verdict where the jury's response must be changed as a matter of law.

*Bogut v. Jannetta*, 410 N.W.2d 451, 454 (Minn.App.1987) (citing *Meinke v. Lewandowski*, 306 Minn. 406, 412, 237 N.W.2d 387, 391 (1975)).

---

**6.** Control Data argued at trial that Musicland negligently failed to obtain the required permit to dewater, and had Musicland complied with permit requirements, it would have discovered the contamination on Control Data's property prior to dewatering activity. The jury, by finding Musicland not negligent, rejected Control Data's argument on the effect of failing to obtain a permit.

■ Since Control Data would have benefitted from establishing Musicland's negligence, it had the burden of proof on the issue of comparative fault. *See Chemlease Worldwide, Inc. v. Brace, Inc.*, 338 N.W.2d 428, 437 (Minn.1983) (a party who stands to benefit from establishing an affirmative proposition of fact essential to a claim bears the burden of proof). Therefore, the trial court acted within its discretion by rendering judgment against Control Data on the issue of comparative fault.

### VII.  Attorney fees

■ Musicland was granted $191,877.79 in attorney fees under MERLA, and Control Data contends that the award was an abuse of the trial court's discretion. Our review of the record reveals no abuse of discretion. The trial court may award costs, disbursements and attorney fees under MERLA. Minn.Stat. § 115B.14 (1990). A reviewing court will intrude upon a trial court's award of fees only where there is a clear abuse of that discretion. *Meyer v. Meyer*, 359 N.W.2d 74, 77 (Minn.App.1984).

■ The starting point for determining reasonable attorney fees is the number of hours reasonably expended working on the case multiplied by a reasonable hourly rate. *Reome v. Gottlieb*, 361 N.W.2d 75, 77 (Minn. App.1985), *pet. for rev. denied* (Minn. July 11, 1985). The results obtained in the litigation are relevant to a determination of the ultimate fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 430, 103 S.Ct. 1933, 1938, 76 L.Ed.2d 40 (1983); *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 541 (Minn.1986). An increased lodestar adjustment may be appropriate based on the difficulty of the case, results obtained, contingent nature of the results, and quality of representation. *Sigurdson v. Isanti County*, 433 N.W.2d 910, 914 (Minn.App.1988), *aff'd* 448 N.W.2d 62 (Minn.1989). The trial court denied Musicland's request for an enhanced lodestar amount.

■ Control Data contends that attorney fees were improperly awarded for all common law and unsuccessful claims. Where a plaintiff succeeds on only some claims and fails on others, two questions must be addressed: whether the unsuccessful claims were related to the successful claims, and whether the plaintiff's level of success makes the hours expended a satisfactory basis for making the fee award. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940. Counsel may raise distinctly different claims for relief that are based on different facts and legal theories. *Id.* Where the claims are unrelated, fees should not be awarded for time expended on the unsuccessful claims. *Id.*, at 434–35, 103 S.Ct. at 1940. In other cases, however, the claims

> will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.
>
> \*      \*      \*      \*      \*      \*
>
> In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.

*Id.*, at 435, 103 S.Ct. at 1940. The most critical factor is the degree of success obtained. *Id.*, at 436, 103 S.Ct. at 1941.

■ Here, the legal theories advanced by Musicland depended on proving a common core of facts. Moreover, the types of relief requested all involved compensation for the loss of use of Musicland's property, and the common law claims were intertwined with the MERLA claim. *Cf. Gopher Oil Co. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir. 1992) (fraud claim was separate and distinct from CERCLA claim because it had a purpose overriding the CERCLA claim; thus, attorney fees for time spent on the fraud claim were not recoverable).

■ Control Data also challenges the trial court's award of attorney fees to the firm of Lindquist & Vennum for time spent negotiating a settlement before this litigation was commenced. We find no abuse of discretion in this award. If Musicland had commenced this lawsuit before making any attempt to settle the dispute, it is likely that attorney

fees would have been incurred in pretrial settlement negotiations. Attorney fees for time expended on the settlement, even if unsuccessful, could be considered reasonable to the action. Here, Musicland was slow to file a lawsuit because it believed it could work out an agreement with Control Data and avoid litigation. Public policy does not favor awarding attorney fees for settlement negotiations where a party is quick to commence a lawsuit but to deny them when a party attempts to settle before commencing a lawsuit. Musicland ultimately prevailed on its MERLA claim, and Lindquist & Vennum provided representation that aided in that action.

The trial court did not abuse its discretion by compensating Musicland for the claims it brought against Control Data. This court, however, has concluded that genuine issues of material fact exist concerning Control Data's MERLA counterclaim. Thus, Musicland should not be compensated for the value of time spent on this unsuccessful motion because Musicland's defense to the counterclaim and its motion for summary judgment were not intertwined with its own MERLA claims. We therefore remand the issue of attorney fees for a determination of the amount to be deducted from the award for time spent on Musicland's summary judgment motion regarding Control Data's counterclaim.

### DECISION

MERLA applied to the facts of this case, and because Control Data failed to present genuine issues of material fact with respect to defenses available under MERLA, summary judgment on the issue of Control Data's liability was proper. Evidence was sufficient to support the jury's finding that Control Data was negligent, and the damages awarded to Musicland were both reasonable and necessary response costs. The trial court did not abuse its discretion by rendering judgment against the party having the burden of proof when confronted with an inconsistent verdict. The trial court erred by awarding attorney fees for time spent on Musicland's summary judgment motion, but the remaining award was not an abuse of the trial court's discretion. The trial court erred by granting summary judgment in favor of Musicland on Control Data's MERLA counterclaim, where genuine issues of material fact exist on the issue of whether Musicland is a responsible person under MERLA.

**Affirmed in part, reversed in part and remanded.**