**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1009
_____

| | | |
|---|---|---|
| Mark Ewald, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| | * | Appeal from the United States District |
| v. | * | Court for the District of Minnesota. |
| | * | |
| Wal-Mart Stores, Inc. | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: October 24, 1997
Filed: March 20, 1998

_____

Before McMILLIAN, BEAM, Circuit Judges, and WEBB,[1] United States District
Judge.

_____

BEAM, Circuit Judge.

Mark Ewald appeals the district court's[2] grant of summary judgment to Wal-Mart on various claims stemming from the termination of his employment. We affirm.

## I.    BACKGROUND

_____

[1]The Honorable Rodney S. Webb, Chief Judge, United States District Court for the District of North Dakota, sitting by designation.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Mark Ewald was employed by Wal-Mart as a management trainee in its Brooklyn Park, Minnesota, store. On May 17, 1995, the store suffered a cash shortage of $5,000. Kim Walters, Wal-Mart's district loss-prevention manager, investigated the following day. She concluded that there had been a theft and, based on statements of co-workers that put Ewald in or near the cash office when the theft had occurred, identified him as the primary suspect. Walters informed the police and other Wal-Mart managers of her suspicions.

Ewald was next scheduled to work on May 21. About halfway through his shift, Ewald was informed that Walters and another district loss-prevention manager, Jonathon Harris, wanted to see him. Walters and Harris interrogated Ewald for over an hour and, although they never directly accused him, strongly implied that they thought Ewald had taken the money. Ewald's account of this interrogation is not pleasant. Walters and Harris falsely told Ewald they had found his fingerprints on the containers from which the money was taken and on security equipment which had been disabled during the theft; they told him that they had his credit report and knew he was in financial trouble, which was also false. When Ewald did not confess to the theft, they became more forceful; raising their voices, leaning forward and speaking into Ewald's face. When Ewald complained that he was uncomfortable, Harris told Ewald he was free to leave. Ewald told his inquisitors that he had nothing further to say, and left the store for his dinner break. When he returned, Harris asked Ewald if he would cooperate further in the investigation. Ewald replied that he would, but only if he could have another member of management or an attorney present. Walters and Harris announced that they didn't deal with attorneys. They then told Ewald that he was suspended.

On May 24, Ewald returned to the store to meet with members of management. Although Ewald had passed a polygraph examination and brought with him a copy of the results, management informed Ewald that he was being dismissed. They gave him an exit interview form that listed "failure to cooperate with an investigation" as the

reason for his termination. Ewald was then informed that he could never enter a Wal-Mart again, and was escorted out of the store by two members of management. Although Walters informed the police of the incident, no charges were ever brought against Ewald or anyone else in relation to the theft.

Ewald filed suit against Wal-Mart claiming 1) breach of contract; 2) wrongful discharge; 3) promissory estoppel; 4) retaliation under Minnesota's whistleblower statute, Minn. Stat. § 181.932; 5) civil conspiracy; 6) defamation; 7) failure to timely pay his wages; and 8) failure to give him timely written notice of the reasons for his termination. Wal-Mart moved for, and the district court granted, summary judgment against Ewald on all claims.

## II.  DISCUSSION

A grant of summary judgment is reviewed de novo. See Lang v. Star Herald, 107 F.3d 1308, 1311 (8th Cir.), cert. denied, 118 S. Ct. 114 (1997). Summary judgment is proper if, taking all facts and reasonable inferences from those facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Id.; see also Fed. R. Civ. P. 56(c). Because jurisdiction in this case is based on diversity of citizenship, Minnesota substantive law applies. See, e.g., Mudlitz v. Mutual Serv. Ins. Co., 75 F. 3d 391, 393 (8th Cir. 1996).

### A.  Breach of Contract

In Minnesota, employment for an indefinite term is terminable at will. See Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1962). However, written employment policies can create unilateral contracts, requiring discharge to be in good faith or for just cause. Pine River State Bank v. Mettille, 333 N.W.2d 622, 626-27 (Minn. 1983). Ewald contends that his employment contract with Wal-Mart was not

at-will, but a contract allowing his termination only for just cause. He has two bases for this contention.

First, Ewald argues that Wal-Mart's "Associate Handbook"[3] created a unilateral employment contract entitling him to termination only for good cause. Whether a handbook constitutes all or part of a contract is determined by the outward manifestations of the parties. Id. at 626. Thus, an employer's disclaimer of intent to form a contract in a handbook will prevent it from being construed as an offer. See Michaelson v. Minnesota Mining & Mfg. Co., 474 N.W.2d 174, 180 (Minn. Ct. App. 1991). In this case, both handbooks contained clear disclaimers. The 1991 handbook admonishes associates to "Please Note . . . the stated policies and benefits are not intended to create nor be interpreted in any way as a contract between Wal-Mart and you. Your employment with Wal-Mart is on an 'at-will' basis." Likewise, in the 1994 Wal-Mart handbook, the company writes that "[t]his handbook is not a contract." Thus, we find that neither handbook created a contract requiring just-cause termination.

Secondly, Ewald argues that even if the handbook did not create a just-cause employment contract, Wal-Mart's "Coaching for Improvement" program did. During the course of his management training, Ewald took a computer tutorial program instructing him on how to discipline employees under this progressive five-step program. He contends he was told by management that no Wal-Mart employee could be dismissed unless Wal-Mart first followed this process.

---

[3]During Ewald's tenure with Wal-Mart, the company produced and disseminated two different employee handbooks; one in 1991 and another in 1994. The provisions of the two are substantially similar and any differences between the two have no impact on our analysis.

We have painstakingly reviewed the record,[4] and can find no support for Ewald's assertion that he was told that Wal-Mart employees could not be fired outside the Coaching for Improvement program. Moreover, whatever members of management may or may not have stated, the company expressly disclaimed any contractual guarantee of specific discipline. The 1991 handbook acknowledgment (which Ewald signed) explains that "nothing stated in this handbook or by any member of management is intended to create any guarantees of any certain disciplinary procedures."

We find no just-cause employment contract; the relationship was at-will. This means that Wal-Mart could fire Ewald for any reason or no reason at all. We do not condone the company's heavy-handed tactics, but find nevertheless, that there is no legal basis for contract liability in this case.

## B.    Defamation

Ewald asserts that three sets of communications defamed him: 1) Walters's identification of Ewald to the police as her main suspect and various statements she made to Wal-Mart management and employees regarding her suspicions about Ewald; 2) management's statement to Ewald that he was being discharged for "failure to cooperate with an investigation," which he was compelled to disclose during his search for other employment; and 3) statements Ewald postulates must have been made to other Wal-Mart employees by management about the circumstances of his discharge.

---

[4]Although we are not called upon in this case to assess attorney conduct, our review of the record has required us to sift through deposition transcripts containing frequent interruptions, unjustified instructions to witnesses not to answer questions, and argumentative and suggestive objections by Ewald's counsel. We remind counsel that merely because depositions do not take place in the presence of judges does not mean lawyers can forget their responsibilities as officers of the court.

In order to be actionable as defamation under Minnesota law, a statement must be false and tend to harm the plaintiff's reputation in the estimation of the community. See Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980). However, even if a defamatory statement has been made, the originators of the statement may escape liability if they are entitled to a qualified privilege. Lewis v. Equitable Life Assur. Soc'y, 389 N.W.2d 876, 889 (Minn. 1986). Under Minnesota law, an employer is entitled to qualified privilege if the communication was made on a proper occasion and for a proper purpose, and if the statements were based on reasonable and proper grounds. Id. Communications between an employer's agents made in the course of investigating or punishing an employee for misconduct are qualifiedly privileged. See McBride v. Sears, Roebuck & Co., 235 N.W.2d 371, 374 (Minn. 1975) (privilege applies because an "employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees"). Likewise, communications made to an employee concerning the reasons for his or her discharge are qualifiedly privileged. See Harvet v. Unity Medical Ctr., 428 N.W.2d 574, 579 (Minn. Ct. App. 1988). Finally, communication to employees about the reasons for another employee's discharge are also qualifiedly privileged. See Wirig v. Kinney Shoe Corp., 461 N.W.2d 374, 380 (Minn. 1990).

We find that all of Wal-Mart's statements are entitled to qualified privilege. Walters's disclosures were made in the course of investigating employee misconduct. The statement to Ewald that he was being terminated for failure to cooperate in an investigation was made only to explain the reason for his discharge. Finally, even if Ewald's suspicions about what management told other Wal-Mart employees were eventually confirmed (and this is not supported by the record), these disclosures would be qualifiedly privileged as communications to employees as to the reasons for another employee's discharge.

A qualified privilege may be lost, however, if abused. Lewis, 389 N.W.2d at 890. Abuse is established if the plaintiff demonstrates that the defendant acted with

actual malice, which exists where the defendant's statements were made from "ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff."  Stumpges, 297 N.W.2d at 257 (quotation omitted).  Ewald argues that Walters's investigation was deficient, and that her failure to fully investigate the facts before making the alleged defamatory statements establishes actual malice.

We find no evidence of such actual malice.  The uncontradicted evidence shows first, that Walters had established that a theft had actually occurred and interviews of other employees did not contradict that conclusion.  Furthermore, no one involved had any grudge against Ewald, and Walters double-checked the details of the employee statements, confirming them where possible. Walters conducted an independent investigation, relying on information from known sources.  In sum, the evidence indicates that Wal-Mart's managers acted on a reasonable belief that Ewald had been involved in the theft and their statements were based on that belief.  Compare  Karnes v. Milo Beauty and Barber Supply Co., 441 N.W.2d 565, 569 (Minn. Ct. App. 1989) (no actual malice when sole motivation behind allegedly defamatory statements was proper concern about possible theft) with Smits v. Wal-Mart Stores, Inc., 525 N.W.2d 554, 557 (Minn. Ct. App. 1994) (malice established where store manager told police he had witnessed shoplifting, even though he had not actually seen the crime, and even though other employees told him they were not sure a theft had even occurred); Thompson v. Campbell, 845 F. Supp. 665, 681 (D. Minn. 1994) (malice established because accusation came from an employee with a motive to retaliate against the plaintiff, and the company failed to confirm the details of the charge before dismissing her); and Wirig, 461 N.W.2d at 380 (malice established because employer conducted no investigation of the charges against the employee, and instead relied on accusations made by an employee whose credibility was questionable and on secondhand hearsay from unidentified sources).  Summary judgment in Wal-Mart's favor on the defamation claim was proper.

We have carefully considered each of the remainder of Ewald's claims and find them to be without merit.

## III.  CONCLUSION

For the foregoing reasons, the opinion of the district court is affirmed.

WEBB, Chief District Judge, concurring specially.

I concur in the result of this case because the law is clearly in Wal-Mart's favor. I write separately, however, to express my concern with the present state of the Minnesota "at will" employment doctrine as it pertains to employee handbooks.  In my view, courts are placing too much emphasis on disclaimers rather than searching for the true intent of employee handbooks as a whole.  Savvy employers such as Wal-Mart should not be allowed to hide behind relatively inconspicuous disclaimers when in the same breath they outline detailed procedures for discipline or termination.  These illusory promises have no purpose other than to provide employees a false sense of security and stability in their employment, a purpose which should not be so readily condoned by the courts.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.